## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ZACHARY JAMES BOYD, | CASE NO. 1:24-CV-01277-CEF |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Zachary Boyd challenges the Commissioner of Social Security's decision denying supplement security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g) and the matter is referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of July 26, 2024). Following review, and for the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings.

### PROCEDURAL BACKGROUND

Mr. Boyd applied for SSI on December 9, 2021, alleging a disability onset date of August 18, 2015.[1] (Tr. 76). The claim was denied initially and on reconsideration. (Tr. 78-100, 103-09).

---

[1]     Mr. Boyd's prior claim for SSI benefits was denied in April 2021. (Tr. 17). That decision adjudicated the period from the alleged onset date of August 2015 through the decision date in April 2021 and the ALJ determined good cause was lacking to reopen that application. (*Id.*). SSI benefits are not retroactive and, generally, the earliest possible onset date in an SSI claim is the application filing date or protective filing date. *See Social Security Administration Program Operations Manual System (POMS)*, SSA POMS DI 25501.370. Thus, the period at issue here begins in April 2021.

Mr. Boyd then requested a hearing before an administrative law judge. (Tr. 144). Mr. Boyd

(represented by counsel) and a vocational expert (VE) testified before the ALJ on July 21, 2023.

(Tr. 34-55). On August 30, 2023, the ALJ determined Mr. Boyd was not disabled. (Tr. 14-29). On

May 28, 2024, the Appeals Council denied Mr. Boyd's request for review, making the hearing

decision the final decision of the Commissioner. (Tr. 1; *see* 20 C.F.R. § 404.981). Mr. Boyd then

timely filed this action on July 26, 2024. (ECF #1).

Factual Background

## I.      Personal and Vocational Evidence

Mr. Boyd was 23 years old on the date he filed his application and 25 years old at the

hearing. (*See* Tr. 182). He is a high school graduate and has no work history. (Tr. 51, 229). In

eleventh grade, Mr. Boyd converted to online schooling and was subject to a 504 plan for

migraines, allowing for extra time, frequent breaks, small-group instruction, and a reader when

family could not assist his reading. (*See* Tr. 81). He had to repeat senior year and graduated in June

2017. (Tr. 335, 354).

## II.     Relevant Medical Evidence[2]

Mr. Boyd has a long history of headaches and migraines. Earliest available records show in

April 2016 when Mr. Boyd was 18 years old, he established care with Catalyst Life Services for

mental health treatment and during the initial diagnostic assessment he reported experiencing

about two migraines a week. (Tr. 320). He also reported never working, due in part to his

migraines. (Tr. 322). In June 2016, he reported headaches occurring five times a week and his

most recent headache kept him in bed all day long. (Tr. 335). Medications intended to treat his

---

[2]      Mr. Boyd challenges only the ALJ's evaluation of his migraine headaches. I limit my
summarization of the medical record accordingly.

migraines were ineffective. (Tr. 325, 360). In May 2017, he endorsed staying in bed five of seven days with a headache. (Tr. 347). He described his headaches as pain over his entire head, behind his eyes, and sometimes on one side that lasts all day that are associated with lightheadedness, nausea, vomiting, and blurry vision. (*Id.*).

In 2018, he went to the emergency room for treatment after two days of migraine pain. (*See* Tr. 363). He reported when he has a migraine it affects him the whole day and that Botox reduced the frequency of his migraines. (*Id.*). In 2019, he reported no longer taking Botox because it was not helping him. (Tr. 372). He twice sought emergency care for migraines that year, one of which lasted two days before he sought emergency treatment. (Tr. 726, 733). Both times his headache resolved with IV fluids, Toradol, Reglan, and Benadryl. (Tr. 727, 736). In 2020, Mr. Boyd attended a counseling session as a migraine was starting. (Tr. 384). His blood pressure and pulse rate were abnormal, and his mother provided most of the information to the provider. (Tr. 384-85). He continued to report frequent and worsening migraines through the date of his current application. (*See* Tr. 341, 344, 347, 350, 354, 369, 372, 375, 378, 381, 384, 390, 393, 396, 410). Medical records show Mr. Boyd is prescribed Zofran regularly for migraine-related nausea and vomiting. (*See e.g.*, Tr. 766, 829, 1026, 1250).

In January 2020, Mr. Boyd attended a follow-up visit to The Ohio State University Department of Neurology for his migraines. (Tr. 712). He reported 28 migraines a month, described as unilateral, throbbing, and pounding, worse with physical activity, and associated with nausea, vomiting, and noise and light sensitivity. (*Id.*). He tried and failed many abortive and preventative medications, including propranolol, nadolol, gabapentin, Topamax, zonisamide, nortriptyline, Lexapro, naproxen, Excedrin, riboflavin, magnesium, Zofran, hydroxyzine,

3

sumatriptan, rizatriptan, eletriptan, venlafaxine, and Botox. (*Id.*). Mr. Boyd described the migraines as disabling. (*Id.*). Kevin Weber, M.D., prescribed Emgality for migraine prevention. (*Id.*).

About a year before his application date, Mr. Boyd met with certified nurse practitioner Megan Crowley, APRN-CNP, and reported neck pain and headaches. (Tr. 450, 454). Physical examination revealed muscular tenderness on the left side of his neck. (Tr. 454). NP Crowley provided a short course of steroids for neck pain and referred Mr. Boyd to neurology for migraines. (Tr. 456-57).

On July 6, 2021, Mr. Boyd attended the Avita Neurology Clinic and met with Steven Benedict, M.D., for evaluation of his intractable migraine headaches. (Tr. 511). There, Mr. Boyd described a family history of migraines. (*Id.*). His own headaches began around age five. (*Id.*). He explained they can be unilateral or bilateral, are associated with light and sound sensitivity, nausea, and occasional vomiting, and are worse with movement. (*Id.*). He reported having headaches up to five times a week, sometimes lasting all day. (*Id.*). He sometimes wakes with headaches that disturb his sleep pattern. (*Id.*). Mr. Boyd stated naratriptan, an abortive migraine therapy, that worked greater than half the time at relieving his pain. (*Id.*). Dr. Benedict noted some signs and symptoms of a sleep disorder that may contribute to Mr. Boyd's overall migraine frequency. (Tr. 516). He ordered a polysomnogram to evaluate for a sleep disorder, prescribed Aimovig for migraine headache prevention, and counseled Mr. Boyd to continue using naratriptan for abortive therapy and to keep a headache journal. (*Id.*).

In August 2021, Mr. Boyd met with NP Crowley and reported worsening headaches and sleep disturbance. (Tr. 493). In October 2021, Mr. Boyd complained of a sore throat, sinus congestion, and a migraine. (Tr. 497). NP Crowley prescribed a steroid. (Tr. 503).

4

On November 18, 2021, one month before his application date, Mr. Boyd returned to the neurology clinic and reported that naratriptan continued to be very effective as abortive therapy, though he still experienced one-to-two headaches a week. (Tr. 505). Dr. Benedict continued Aimovig and counseled Mr. Boyd to continue using naratriptan, keep a headache journal, and obtain a polysomnogram. (Tr. 509).

On February 1, 2022, Mr. Boyd returned to the neurology clinic and met with certified nurse practitioner Brittani Atwood, APRN-CNP. (Tr. 523). There, he reported five-to-seven migraines a week for the past two months. (Tr. 524). He described them as throbbing, squeezing, and sharp; unilaterally located; associated with nausea, vomiting, and neck pain; and having worsened pain with movement. (*Id.*). He also reported not sleeping well. (*Id.*). Physical examination revealed neck tension. (Tr. 525). NP Atwood doubled Mr. Boyd's dose of Aimovig and referred him for a polysomnogram, noting that an underlying sleep disorder and myofascial trigger point neck spasms may be contributing to his migraines. (Tr. 523). On February 2, 2022, Mr. Boyd returned to NP Crowley and reported insomnia and headaches. (Tr. 586). NP Crowley prescribed Topamax to address those issues. (Tr. 589).

On March 9, 2022, Mr. Boyd met with NP Crowley and complained of a sore throat, congestion, chills, sweats, and a headache lasting one week. (Tr. 582). NP Crowley prescribed a steroid and a Z-Pak for an upper respiratory infection. (Tr. 584). On March 28, 2022, Mr. Boyd complained of continued daily headaches and insomnia, prompting NP Crowley to increase Topamax. (Tr. 578).

On April 29, 2022, Mr. Boyd met with NP Atwood and reported four to five headaches a week, an improvement from his last appointment. (Tr. 519). He did not follow through with his

referral for a polysomnogram, explaining he had to help care for his niece and provide transportation for his sister. (*Id.*). NP Atwood continued his medications and encouraged him to schedule another appointment for a sleep study. (Tr. 518).

In May 2022, Mr. Boyd continued to report headache improvement with Aimovig and improved insomnia. (Tr. 568). He requested discontinuing Topamax because it was not effective for his headaches. (Tr. 571). In October 2022, Mr. Boyd followed up with NP Crowley for ADHD and described improved sleep and continued headaches. (Tr. 559). In November 2022, Mr. Boyd presented for a follow-up appointment and complained of poorly controlled migraines and fatigue. (Tr. 556). He attempted a sleep study but left in the middle of the night because he was uncomfortable and the staff were mean. (*Id.*).

On November 11, 2022, Mr. Boyd attended a follow-up mental health medication management appointment where he complained of more frequent migraines and feeling sick recently. (Tr. 1213). He also described feeling agitated and dysphoric. (Tr. 1216).

On January 17, 2023, Mr. Boyd met with NP Crowley for a follow-up appointment regarding his ADHD where he described worsened sleep and continued headaches. (Tr. 547-48). On March 16, 2023, Mr. Boyd met with NP Crowley and reported improved sleep with continued headaches. (Tr. 1257).

## III.    Medical Opinions

In April 2022, state agency medical consultant Stephen Koch, M.D., evaluated Mr. Boyd's medical records in connection with his disability application. (Tr. 78-85). Dr. Koch determined there were no new or material changes to Mr. Boyd's impairments from his prior unfavorable decision and adopted the prior RFC. (Tr. 84). Accordingly, Dr. Koch opined Mr. Boyd could perform a full range of work at all exertional levels with the following non-exertional limitations:

> The claimant should be able to tolerate simple, routine tasks with few detailed instructions and no fast-paced work or strict production quotas. He should be able to tolerate a position where there are no more than occasional changes that are well explained. He should avoid exposure to extreme vibration, extreme bright lights, and extreme loud noise. The claimant should be able to tolerate occasional but superficial interaction with coworkers and supervisors, with superficial being that which is beyond the performance of job duties and job functions for a specific purpose and a short duration. Additionally, he should also avoid interaction with the public and should also avoid any tandem work.

(Tr. 80). State agency psychological consultant Robyn Murry-Hoffman, Psy.D., reached the same conclusion. (Tr. 82).

On reconsideration review in August 2022, state agency medical consultant Scott W. Bolz, M.D., reviewed updated medical records and adopted Dr. Koch's assessment. (Tr. 98-99). State agency psychological consultant Vicki Warren, Ph.D., determined there was insufficient evidence to assess the severity of Mr. Boyd's mental impairments. (Tr. 97).

Mr. Boyd's neurologists did not offer medical opinions. Dr. Weber's practice as a matter of course does not fill out disability paperwork for headaches. (Tr. 712, 1192).

## IV.    Relevant Testimonial Evidence

During his July 21, 2023 testimony before the ALJ, Mr. Boyd described suffering migraines typically several times a week. (Tr. 42). When he has a migraine, he experiences nausea and vomiting and needs to lie down in a dark, quiet room with an ice pack. (*Id.*). He has not yet found an effective migraine prevention drug but uses an abortive medication when he feels a migraine about to begin. (Tr. 43). His migraines are triggered by bright LED lights, too much or loud noise, screen time, and feeling stressed or overwhelmed. (Tr. 44). He is always anxious, even over small matters. (*Id.*). He explained he cannot maintain a job because he would too often be absent because of his migraines. (Tr. 47). Mr. Boyd has tried to keep a headache journal but "always

forgets" to log the information. (Tr. 49-50). He recently began to use an application on his phone instead. (Tr. 50).

The VE testified a person of Mr. Boyd's age, education, and work experience who is subject to the functional limitations described in the ALJ's RFC determination could work as a janitor, dishwasher, and laundry worker. (Tr. 51-52). The VE stated employers do not tolerate off-task time beyond 10% of the workday and tolerate no more than one absence per month. (Tr. 53).

**V.    Other Relevant Evidence**

On March 2, 2022, Mr. Boyd completed an Adult Function Report describing how his migraines and headaches limit his activities. (Tr. 246-53). There, he reported his migraines get so bad he struggles to be around light and noise, he gets nauseous, and his vision blurs. (Tr. 246). Mr. Boyd finds it difficult to think or focus when he has a migraine. (*Id.*). On a typical day, Mr. Boyd eats meals and does dishes. (Tr. 247). Sometimes he watches his niece or picks her up from school, but when he has a migraine, he lies in bed most of the time. (*Id.*). He shares responsibility for watching his niece and taking care of pets with his mother and father. (*Id.*). Mr. Boyd played soccer in elementary school but stopped because of migraines and has not participated in a sport since. (*Id.*).

Mr. Boyd can prepare simple meals for himself, do the dishes, clean, and mow the lawn once a week, and once a month do his own laundry. (Tr. 248). He relies on his parents, with whom he lives, to remind him to complete these tasks. (*Id.*). He enjoys reading, writing, and playing video games but engages in these activities less frequently and is lucky if he can do them for even an hour a day. (Tr. 250). He is sometimes able to get together with friends every few months and texts every day. (*Id.*).

8

## STANDARD FOR DISABILITY

Eligibility for benefits depends on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is the claimant's residual functional capacity and can claimant perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Boyd had not engaged in substantial gainful activity since April 21, 2021, the date of the prior ALJ's decision. (Tr. 21). At Step Two, the ALJ identified Mr. Boyd's severe impairments as follows: depressive disorder, generalized anxiety disorder, unspecified trauma and stressor related disorder, attention deficit hyperactivity disorder, and migraine headaches. (*Id.*). At Step Three, the ALJ found Mr. Boyd's impairments did not meet the requirements of, or were not medically equivalent to, a listed impairment. (Tr. 22-24).

At Step Four, the ALJ determined Mr. Boyd's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant cannot have exposure to extreme vibration, bright lights, or loud noise (*i.e.*, more than moderate noise as defined in the DOT). The claimant can perform simple, routine tasks in a relatively static environment where there are only occasional changes in work duties and processes and where changes can be explained in advance not involving a fast assembly line workplace or strict production quotas and that do not involve more than occasional and superficial contact with co-workers or supervisors, where superficial is defined as nothing beyond job duties and job functions for a specific purpose and of a short duration, and not involving more than the straightforward exchange of information without negotiation, persuasion, evaluation, or conflict resolution, and not involving contact with the public.

(Tr. 24). The ALJ noted Mr. Boyd does not have past relevant work. (Tr. 28). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Mr. Boyd can perform, including janitor, dishwasher, and laundry worker. (Tr. 29). Therefore, the ALJ found Mr. Boyd was not disabled. (Tr. 29).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

10

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Along with considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's

11

decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.")

ANALYSIS

Mr. Boyd argues the ALJ erred in evaluating his migraines. He claims the ALJ erred at Step Three of the sequential analysis by not addressing evidence showing his migraines occurred at the frequency and severity required to medically equal Listing 11.02(B). (ECF #7 at PageID 1674). He also claims the ALJ did not properly evaluate his reported symptoms under the correct legal standards and did not identify substantial evidence supporting the RFC. (*Id.* at PageID 1680). The Commissioner responds the ALJ reasonably concluded Mr. Boyd did not meet his burden to establish his migraines medically equal Listing 11.02 and the RFC reasonably accounts for migraine-related limitations. (ECF #9 at PageID 1688).

## I.    Legal Framework for Step Three Analysis of Migraine Headaches

At Step Three, if the claimant's impairment meets or medically equals one of the listings in the Listing of Impairments, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F.App'x 488, 491 (6th Cir. 2010). The Listing of Impairments in

12

Subpart P, Appendix 1 of the regulations describes impairments that are "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F.App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 416.925(c)(3)). The claimant bears the burden to prove the impairment meets or medically equals a listing. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). To do so, the claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.* 93 F.App'x 725, 728 (6th Cir. 2004).

When considering whether a claimant's impairment meets or medically equals a listed impairment, an ALJ must evaluate the evidence, compare it to the relevant listed impairment, and give an explained conclusion to facilitate meaningful judicial review, without which is it impossible to say the ALJ's decision at Step Three is supported by substantial evidence. *Reynolds*, 424 F.App'x at 416. Relevant to Mr. Boyd's situation, if the claimant's impairment is not described in the Listings, the ALJ will use closely analogous listed impairments and, if the claimant's impairment is of at least equal medical significance to the analogous listed impairment, the ALJ will find the claimant's condition medically equals the listing. 20 C.F.R. § 416.926(b)(2). The claimant's condition medically equals a listing if it is "at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 416.926(a). The ALJ's medical-equivalence determination is based on all evidence about the claimant's impairment, including the symptoms and their effects. *Id.* § 416.926(c).

13

The ALJ need not "'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F.App'x 639, 641 (6th Cir. 2013)). An "ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson*, 579 F.App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)) (alteration in original).

Whether a claimant's impairment medically equals a listed impairment is a decision reserved for the ALJ. 20 C.F.R. § 416.926(e)(3). Social Security Ruling (SSR) 17-2p explains how ALJs make medical-equivalence findings. *See* SSR 17-2p, 2017 WL 3928306 (Mar. 27, 2017).[3] A claimant is disabled based on medical equivalence if there is a preponderance of the evidence of one of the following:

1.   A prior administrative medical finding from a medical or psychological consultant from the initial or reconsideration adjudication levels supporting the medical equivalence finding.

2.   Medical expert evidence, which may include testimony or written response to interrogatories, obtained at the hearings level supporting the medical equivalence finding.

3.   A report from the Appeals Council's medical support staff supporting the medical equivalence finding.

*Id.* at *3.

If the ALJ believes the impairment is medically equivalent to a listed impairment, the ALJ must articulate how the record established medical equivalence and provide a reasonable rationale sufficient for a subsequent reviewer or the court to understand the decision. *Id.* If the ALJ believes

---

[3]   While SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the SSA. *See, e.g.*, SSR 19-4p at *1.

the evidence already received in the record does not reasonably support a finding that the claimant's impairment medically equals a listed impairment, the ALJ need not articulate specific evidence supporting the finding. *Id.* Generally, a statement that the claimant's impairment does not medically equal a listed impairment is sufficient articulation for the finding, but the ALJ's articulation for why the individual is not disabled at a later step in the disability evaluation must provide a rationale sufficient for a subsequent reviewer to determine the basis for the finding of medical equivalence at Step Three. *Id; see also Forrest v. Comm'r of Soc. Sec.*, 591 F.App'x 359, 366 (6th Cir. 2014) (looking to factual findings elsewhere in the ALJ's decision to affirm the medical equivalency determination at Step Three).

Even if the decision as a whole does not provide sufficient rationale, the claimant must still raise a "substantial question" as to whether he satisfied a listing to warrant remand. *See Reynolds,* 424 F.App'x at 416. To raise a substantial question, the claimant must point to specific evidence demonstrating the claimant reasonably could meet or equal every requirement of the listing. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 432 (6th Cir. 2014).

SSR 19-4p guides the analysis of primary headache disorders. SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). Although primary headache disorder is not a listed impairment, it may medically equal Listing 11.02 (Epilepsy), the most closely analogous listed impairment. *Id.* at *7. If the claimant exhibits equivalent signs and limitations to those detailed in Listing 11.02B for dyscognitive seizures, the ALJ may find the impairment medically equals the listing:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, [the ALJ] consider[s]: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example premonitory symptoms, aura, duration, intensity, and

accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* Thus, migraines may medically equal Listing 11.02 when they are as severe as dyscognitive seizures and they "occur[] at least once a week for at least 3 consecutive months." Listing 11.00H1b instructs that dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. As the SSA materials point out, the ALJ's focus should be on records from treating sources memorializing the claimant's statements about his symptoms, including intensity, type of headache pain, nausea, photophobia, the need to lie down in a dark and quiet room, medications, and the duration and frequency of the headaches. SSR 19-4p at *7. "Ultimately, the SSR 19-4p inquiry requires asking whether a claimant's headaches interfere so significantly with the claimant's ability to partake in daily activities with sufficient frequency so as to justify a finding of disability." *Mills v. O'Malley*, 6:23-CV-156-HAI, 2024 WL 150292, *2 (E.D. Ky. Jan. 12, 2024); *see Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, *8 (W.D. Ky. Feb. 9, 2021) (collecting cases).

## II.  The ALJ did not articulate specific findings supporting his determination at Step Three that Mr. Boyd did not medically equal Listing 11.02B.

The ALJ determined Mr. Boyd's migraines did not medically equal Listing 11.02:

Although the claimant has impairments that are considered "severe," there is little to no medical evidence in the record to support a finding that the claimant's impairments, singly or in combination, meet or equal the requirements set forth in the Listing of Impairments (Appendix 1, Subpart P, 20 CFR, Part 404). This finding is consistent with that of the State Agency expert medical consultants who found that no listing is met or equaled, and no medical evidence has been submitted subsequent to their review that would alter that conclusion. Additionally, no treating or

16

examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments.

There is no listing for migraine headaches; however, the allegations related to the claimant's impairment are similar to those of [Listing] 11.02, *Epilepsy*. However, the medical evidence does not show headaches of the frequency and severity that the claimant alleges, that is four or more migraines per week (hearing testimony). Moreover, there is no evidence of marked limitation in any of the listed domains, *i.e.*, physical functioning, understanding, remembering, or applying information, interacting with others, concentration, persistent, or maintaining pace, or adapting or managing oneself.

(Tr. 23).

The ALJ correctly identified epilepsy was an analogous listing but, save for Mr. Boyd's hearing testimony about the frequency of his headaches, did not compare the evidence with the criteria identified in SSR 19-4p. The ALJ does mention the severity of Mr. Boyd's headaches by stating there was no acceptable evidence describing the headaches. But as I discuss below, the ALJ erred in rejecting that evidence. Moreover, the ALJ's conclusion that the evidence does not support Mr. Boyd's allegation that he suffers four or more migraines a week says nothing about whether he medically equals the criteria of the listing, which is met by just one migraine a week for three consecutive months. Thus, this analysis is deficient.

But, as SSR 17-2p indicates, the ALJ need not articulate specific evidence supporting his findings that the impairment does not medically equal a listed impairment so long as the ALJ's articulation at a later step in the sequential evaluation provides sufficient rationale for a subsequent reviewer to determine the basis for the finding about medical equivalence at Step Three. Thus, the inquiry does not end here; the court must look to see if the ALJ's decision as a whole provides a sufficient rationale. If so, the ALJ's cursory evaluation at Step Three does not warrant remand.

17

**III.    The decision as a whole does not provide sufficient rationale to determine the basis for the ALJ's conclusion at Step Three and the ALJ erred in evaluating Mr. Boyd's statements about the intensity, persistence, and limiting effects of his migraines.**

Looking to the ALJ's factual findings elsewhere in the decision, there is not sufficient rationale for the finding of no medical equivalence at Step Three. As mentioned above, the ALJ should discuss the relevant listing "where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Smith-Johnson,* 579 F.App'x at 432 (alteration in original). The record raises a substantial question whether Mr. Boyd could medically equal Listing 11.02B. But the ALJ's analysis of the record has two major faults so the ALJ's cursory evaluation at Step Three warrants remand.

First, support for Mr. Boyd's migraine headaches satisfying Listing 11.02B was borne of statements he made to his medical providers about his symptoms. The ALJ found those statements less than fully consistent with objective medical evidence, but the ALJ improperly evaluated the statements. Second, the ALJ noted medical records showing Mr. Boyd's frequent reports of migraines and associated symptoms, the effectiveness of his prescribed treatment, periods of improvement, and his limited ability to function during a migraine. (Tr. 25-27). That evidence could meet the criteria to medically equal Listing 11.02B. Mr. Boyd appears to meet the ICHD-3 diagnostic criteria for migraine without aura used in SSR 19-4p because he described headaches lasting more than four hours, unilateral in location, pulsating or throbbing, severe, aggravated by movement, and accompanied by nausea, vomiting, photophobia, and phonophobia. (Tr. 511, 524). In addition, even when Mr. Boyd noted improvement with medication, he still reported no less than one-to-two migraines each week (*see* Tr. 505, 519), exceeding the frequency of headaches despite treatment that might justify medical equivalence with Listing 11.02B.

A.    **The ALJ did not properly evaluate Mr. Boyd's statements about his migraines.**

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant or gleaned from other medical and non-medical sources. *Id.*

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ need not accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F.App'x 496, 508 (6th Cir. 2006).

The regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*

19

*v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); *see also* SSR 16-3p at *10. The ALJ need

not use any "magic words," so long as the decision as a whole is clear why the ALJ reached a

specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL

3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives

great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019

WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not

disturb the ALJ's analysis of the claimant's subjective complaints and the conclusions drawn from

it. *Id.* (internal quotations and citations omitted).

Here, the ALJ first described Mr. Boyd's statements about the intensity, persistence, and

limiting effects of his migraine-related symptoms:

> The claimant alleges disability due to migraines, depression, anxiety, and ADHD. He
> endorses being easily overstimulated, resulting in lashing out and screaming at
> others. He previously enjoyed playing video games, but lost interest and energy to
> play. He endorses lack of motivation to do anything. He is sensitive to loud and
> bright spaces. He is always stressed and on edge. He has difficulty understanding
> what people say to him. He is forgetful and has difficult speaking to people. He
> endorses frequent migraines wore [*sic*] with sound and light. He endorses
> lightheadedness, blurred vision, and nausea. He reports greater than 15 migraines
> per month. He lays down multiple times per day due to headaches. At the hearing,
> the claimant testified that he has migraines four times per week. He slept in a dark,
> quiet room with an icepack to alleviate symptoms. He testified that bright lights,
> computer screens, loud or too many noises, and stress triggered migraines. He
> testified that he has constant anxiety and depression. He testified that medication
> did not significantly help symptoms. . . . He testified that he performed limited
> household chores. He washed the dishes, mowed the lawn, and washed his own
> laundry. He testified that he would call off work too much due to migraines and
> would be unable to keep up with job requirements due to ADHD. He testified that
> he no longer played video games.

(Tr. 25) (citations omitted).

After summarizing the medical evidence, the ALJ determined Mr. Boyd's statements about the intensity, persistence, and limiting effects of his migraine-related symptoms were inconsistent with the evidentiary record:

> As to migraines, these also appear to be controlled by medication. The claimant was happy with the improvement in headaches and at one point, reported abortive medications were effective 95% of the time. The claimant never sought emergency care for severe migraines. He did not appear in distress with entirely intact neurological findings. Furthermore, there are several references to noncompliance with treatment, as the claimant failed to undergo a sleep study as ordered, ran out of medication on several occasions, failed to follow through with several appointments, and failed to keep a migraine log despite allegations of debilitating headaches. The lack of compliance with the doctors' recommendations is generally inconsistent with disabling physical or mental conditions.

(Tr. 27).

While the ALJ considered some applicable factors (efficacy of and compliance with treatments and recommendations, nature of symptoms, and extent of care sought), the evaluation of Mr. Boyd's symptoms as a whole is not supported by substantial evidence. The ALJ's analysis suffers three major problems. First, the medical record evidence as a whole does not support the ALJ's conclusion that Mr. Boyd's migraines were controlled with medication. Second, the ALJ unreasonably determined that Mr. Boyd's normal neurological examinations were inconsistent with the alleged frequency and severity of his migraines. Third, the ALJ did not explore why Mr. Boyd did not adhere to treatment as required nor explain how his migraine symptoms would have improved had he done so.

**Controlled with medication.** The medical records indicate that in November 2021, Mr. Boyd reported significant improvement with naratriptan, the abortive medication, but even with naratriptan he still had one-to-two migraines a week (Tr. 505), exceeding the minimum frequency criteria to establish medical equivalence under Listing 11.02B. *See* SSR 19-4p at *7. It also makes

sense that Mr. Boyd continues to report migraines even while endorsing relief with naratriptan because current medical research dictates limiting use of acute migraine treatments like triptans to no more than two days per week or 10 days per month. (Tr. 1192; *see also* Tr. 738 ("Discussed medication overuse headache and to limit use of acute treatments to no more than 2 days/week or 10 days/month")).

Three months later, in February 2022, Mr. Boyd described having five-to-seven migraines per week for the past two months. (Tr. 524). NP Atwood then increased the dose of his migraine prevention medicine, Aimovig. (Tr. 523). That same month, NP Crowley prescribed Topamax for his headaches. (Tr. 589). In April 2022, Mr. Boyd again reported improvement in the frequency of his migraines, endorsing four-to-five a week down from five-to-seven. (Tr. 519). By November 2022, he reported poorly controlled and more frequent migraines. (Tr. 556, 1213).

Taken as a whole, the record evidence does not support the ALJ's conclusion that Mr. Boyd's migraines were controlled with medication. When considered against the full record, Mr. Boyd's short-lived improvement is not "such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion." *See Besaw*, 966 F.2d at 1030. In addition, relevant to my review for sufficient rationale to support the ALJ's Step Three determination on medical equivalence, the record as a whole suggests that Mr. Boyd's statements, if accepted as true, appear to medically equal Listing 11.02B.

**Intact neurological examinations.** The ALJ determined Mr. Boyd's statements about the frequency and severity of his migraines were inconsistent with his normal neurological evaluations but the explanation is, in this context, an unreasonable basis to discount those statements. SSA guidance establishes that ALJs "must limit their evaluation to the individual's statements about his

or her symptoms and the evidence in the record that is relevant to the individual's impairments."
SSR 16-3p, at *11. SSR 19-4p states that "[p]rimary headache disorders are a collection of chronic
headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-
sensitive structures in the head," examples of which include "migraines, tension-type headaches,
and trigeminal autonomic cephalalgias." SSR 19-4p at *3. Migraines can be with or without "aura."
"Aura" describes "early symptoms of a migraine, believed to be the manifestations of focal cerebral
dysfunction." *See Definition of Terms*, *Int'l Headache Soc.*, https://ichd-3.org/definition-of-terms/
(last accessed April 7, 2025).[4] A migraine with aura is "accompanied by visual, sensory, and other
central nervous system symptoms," including motor, brainstem, or retinal symptoms. *Id.* at *3-4. In
contrast, a migraine without aura is accompanied by nausea, vomiting, or photophobia or
phonophobia. *Id.*

A migraine without aura has three diagnostic criteria: (1) a headache lasting 4 to 72 hours
(either untreated or unsuccessfully treated); (2) two of four characteristics including unilateral
location, pulsating quality, moderate, or severe pain intensity, or aggravation by or causing
avoidance of routine physical activity; and (3) during the headache, the claimant has nausea,
vomiting, photophobia, or phonophobia. SSR 19-4p, 2019 WL 4169635, at *5. Important here,
the ICHD-3 criteria for migraine without aura do not consist of neurological signs but of
associated symptoms including nausea, vomiting, phonophobia, and photophobia. *Id.* at *3. In
contrast, migraine *with aura* has neurological signs and is "accompanied by *visual, sensory, and other
central nervous system symptoms,*" including motor, brainstem, or retinal symptoms. *Id.* at *3-4

---

[4]     The SSA refers to terms and criteria developed by the International Headache
Society's third edition of the International Classification of Headache Disorders (ICHD-3) in
developing SSR 19-4p. *See* SSR 19-4p, 2019 WL 4169635, at *2.

(emphasis added). The term "aura" itself means "early symptoms of a migraine, believed to be the manifestations of focal cerebral dysfunction." *IHS Classification ICHD-3,* Definition of Terms (available at https://ichd-3.org/definition-of-terms/) (last accessed April 7, 2025).

As the foregoing guidelines and terminology strongly suggest, intact neurological findings may be inconsistent with migraines *with* aura, but they are not necessarily inconsistent with migraine *without* aura. Indeed, during the relevant timeframe Mr. Boyd regularly denied focal neurological issues (Tr. 505, 511, 519) and his neurologist stated he "does not have any focal neurological findings suggestive of an intracranial process contributing to headaches." (Tr. 509, 516). But Mr. Boyd's statements about his headaches indicate migraines without aura as his migraines are associated with nausea and vomiting (*see* Tr. 347, 524, 712) as well as photophobia and phonophobia (*see* Tr. 44, 246, 511). The ALJ has not explained why the absence of abnormal neurological examinations is relevant proof discrediting Mr. Boyd's statements his migraines without aura.

**Adherence to treatment.**  Finally, the ALJ concludes that Mr. Boyd's failure to comply with his providers' recommendations is "generally inconsistent with disabling physical or mental conditions." (Tr. 86). SSA guidance indicates that "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms," the ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p at *9. But the ALJ first must consider possible reasons the individual may not comply with treatment or seek treatment consistent with

the degree of his complaints, such as by contacting the individual or asking for an explanation at the administrative hearing. *Id.*

The ALJ did not follow this guidance. The ALJ accurately notes Mr. Boyd did not attend a scheduled sleep study because he needed to help care for his niece and drive his sister. (Tr. 26). The ALJ does not mention that Mr. Boyd did attend a later-scheduled sleep study in late 2022 but left in the middle of the night because of his discomfort. (Tr. 556). The ALJ did not ask Mr. Boyd if he made a third attempt or explore why he left during the second attempt. Similarly, the ALJ noted that Mr. Boyd missed several appointments (Tr. 85) but made no effort at the administrative hearing to find out why he missed them or if the appointments were rescheduled. Because the ALJ did not inform himself of the reasons why Mr. Boyd did not complete a sleep study and missed several appointments, the ALJ cannot not properly discount Mr. Boyd's statements about his migraines on this basis. *See* SSR 16-3p at *9.

Next, the ALJ states Mr. Boyd was not compliant with treatment recommendations because several times he ran out of medications prescribed for mental health symptoms. (Tr. 85-86). Again, the ALJ did not consider possible reasons for Mr. Boyd's noncompliance. Nor did the ALJ explain how Mr. Boyd's mental health medications were intended to improve his migraine-related symptoms. Without that link, the ALJ cannot properly discount Mr. Boyd's statements about his migraines on this basis. *See* SSR 16-3p at *9.

In sum, the ALJ's conclusion that Mr. Boyd's statements about the intensity, persistence, and limiting effects of his migraine-related symptoms are inconsistent with other evidence of record is not supported by substantial evidence. In addition, to reach his finding of non-disability, the ALJ contravened SSA standards for evaluating a claimant's symptoms. Thus, the ALJ's

25

discounting of Mr. Boyd's statements does not provide a sufficient rationale to explain the cursory findings at Step Three.

**B.**     **Mr. Boyd has raised a substantial question that he satisfied the listing criteria.**

Mr. Boyd has pointed to specific evidence demonstrating he reasonably could equal Listing 11.02B, including that he has unilateral migraines without aura accompanied by nausea, vomiting, photophobia, and phonophobia that occur despite adherence to prescribed migraine-related treatment, and that he must lie down in a dark, quiet room with an icepack and sleep it off. His statements about the intensity, persistence and limiting effects of his migraine-related symptoms, if accepted as true, would support a finding of medical equivalency to Listing 11.02B. The Commissioner argues this evidence consists of his subjectively reported symptoms that do not meet the criteria of SSR 19-4p. (ECF #9 at PageID 1700). I disagree.

First, internal agency guidance for processing such claims suggests the ALJ can make a medical-equivalency determination based on reported symptoms. In POMS DI 24505, the SSA provides an example of how migraine-related medical equivalency determinations are made:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.02, Epilepsy, Dyscognitive seizures. Therefore, 11.02 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment.

POMS DI 24505.015(B)(7)(b), Example 2. The example shows that medical findings based on a claimant's description of her symptoms to her medical provider are enough to show equal medical significance to Listing 11.02.

26

Similarly, when an ALJ evaluates whether a primary headache disorder is equal in severity and duration to the criteria for seizures in Listing 11.02B, the ALJ considers a detailed description from an acceptable medical source of a typical headache event, including (1) accompanying symptoms, (2) the frequency of headaches, (3) adherence to prescribed treatment, (4) side effects of treatment, and (5) limitations in functioning that may be associated with the disorder or effects of its treatment. *Id.* at *7. The medical provider's description of an individual's typical headache event will, of course, be based on the individual's reported symptoms. If, as the Commissioner asserts, reported symptoms do not satisfy the criteria in SSR 19-4p, then arguably no claimant could medically equal Listing 11.02B unless the medical provider observed firsthand an individual actively suffering a migraine attack. The difficulty in securing such observation is patent because migraine attacks are not readily predictable events, and an individual cannot schedule a medical appointment and ensure that a migraine will occur coincident with the meeting. Nor do medical providers often meet with their patients for hours on end to fully observe a migraine attack firsthand. It would make little sense to conclude SSR 19-4p precludes finding medical equivalence based on a claimant's reported symptoms, especially when the criteria the ALJ must consider is grounded in information collected from a claimant's reports to his medical providers. Doing so would render SSR 19-4p largely superfluous.

Also, the Commissioner is misplaced in suggesting that to medically equal Listing 11.02B the acceptable medical source must also provide an opinion about the limitations in functioning associated with his migraines. (ECF #9 at PageID 1700) (citing *Hodge v. Comm'r of Soc. Sec.*, No. 1:24-cv-00059, 2024 WL 3508646, at *9 (N.D. Ohio July 23, 2024), and quoting *Snyder v. Comm'r of Soc. Sec.*, No. 22-5948, 2023 WL 3673265, at *4 (6th Cir. May 26, 2023) (per curiam)). In *Snyder,*

a recent unpublished decision, the Sixth Circuit upheld the ALJ's determination that headaches did not medically equal Listing 11.02B, noting the claimant did not point to "a statement from an acceptable medical source that complies with SSR 19-4p, *i.e.*, one that provides a detailed description of a typical migraine event, the side effects of her medications, and most importantly, an opinion concerning the limitations in functioning associated with her migraines." 2023 WL 3673265, at *4. But the language of SSR 19-4p places no such requirement on the acceptable medical source to provide an opinion about functional limitations. *See Nagy v. Comm'r of Soc. Sec.*, 2023 WL 2404061, at *7 (N.D. Ohio March 8, 2023) (holding medical opinion not required under SSR 19-4p). Rather, the SSA requires a detailed description from an acceptable medical source that includes "limitations in functioning that may be associated with the disorder or effects of its treatment." *Id.* at *7. I cannot reconcile why the *Snyder* decision seemingly reads into the SSR a non-existent requirement. Regardless, because *Snyder* is an unpublished opinion, it is not considered binding but instead provides only persuasive authority. *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007); *see also Jones v. Fluor Facility & Plant Servs.*, No. 24-5249, 2025 WL 707869, at *10 (6th Cir. Mar. 5, 2025). For this reason, I decline the Commissioner's invitation to treat *Snyder* as controlling the outcome here.

Finally, the Commissioner argues the State Agency medical consultants determined Mr. Boyd did not medically equal Listing 11.02B. "[A]n ALJ is permitted to rely on state agency physician's opinions to the same extent as she may rely on opinions from other sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 274 (6th Cir. 2015). But in reviewing the State Agency medical consultants' prior administrative medical findings, I note the consultants did not assess whether Mr. Boyd's migraines met or equaled Listing 11.02B. (Tr. 83, 91) (identifying Listing

11.02 but not providing assessment). Without an actual assessment of the medical equivalence, the prior administrative medical findings are not substantial evidence of that issue.

For these reasons, I recommend the District Court reverse the Commissioner's denial of SSI and remand the matter for additional proceedings.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend that the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** for additional proceedings.

Dated: April 9, 2025

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge. Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the**

exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).